## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:                                    )
                                          )
STEPHEN NEUMAN ASAMOAH,                    )          Case No. 21-11888-BFK
                                          )          Chapter 13
                    Debtor.                )
_____)

## MEMORANDUM OPINION
## AND ORDER

This matter comes before the Court on the Chapter 13 Trustee's Motion to Dismiss and on the Motion to Dismiss of Elizabeth Nana Nsiah. (Docket Nos. 14, 19). The Motions are joined by Woehrle Dahlberg Yao, PLLC ("the Firm"), and Joseph Goldberg. (Docket Nos. 16, 17). The Court heard the evidence and the parties' arguments on February 25 and 28, 2022. For the reasons stated below, the Court will order the Debtor to file and obtain confirmation of a Plan that will pay his creditors 100% of their allowed claims. If the Debtor is unable to do so, or if the case is dismissed (or if the Debtor seeks to convert the case) at any time before the case is closed, the case will be dismissed with prejudice for a period of one year.

### Findings of Fact

The Court, having heard the evidence, makes the following findings of fact.

1.      Stephen Neuman Asamoah ("the Debtor") is an individual residing in Stafford County, Virginia. He works as a software developer and owns a company called Tech Giants, Inc. ("Tech Giants"). He is 53 years old. He began his employment with Tech Giants in 2020.

2.      Thomas P. Gorman ("the Trustee") is the Chapter 13 Trustee in this case.

3.      The Firm is a law firm with offices in Northern Virginia. The Debtor engaged the Firm to represent him in his divorce proceedings in the Stafford County Circuit and Juvenile and Domestic Relations Courts.

4.      Ms. Nsiah is the Debtor's ex-wife, and is a creditor in this case.

5.      Mr. Goldberg is an attorney. The Debtor met with Mr. Goldberg in anticipation of filing for bankruptcy, but ultimately did not engage Mr. Goldberg.

*A.   The State Court Divorce Proceedings.*

6.      The Debtor filed for a divorce from Ms. Nsiah in the Stafford County Circuit Court on January 10, 2020. EN Ex. 1 (Docket No. 21).[1]

7.      During the divorce proceedings, Ms. Nsiah submitted an Amended Personal Information Schedule and Factors for Equitable Distribution ("the ED Worksheet"). WDY Ex. 6 (Docket No. 66).

8.      The ED Worksheet included a reference to a property owned jointly by the Debtor and Ms. Nsiah located in Ghana ("the Ghana Property"). The Ghana Property was listed on the ED Worksheet as having an unknown value. WDY Ex. 6, at 2 (Docket No. 66).

9.      The Debtor subsequently procured an appraisal of the Ghana Property, which indicated a market value of $254,000.00 (USD), and a forced sale value of $203,200.00 (USD), as of June 1, 2020. TR Ex. 6, at 2 (Docket No. 62). The Appraisal identified the property as being "a well-built residential facility at 82% completion." TR Ex. 6, at 2 (Docket No. 62).[2]

---

[1]  The Debtor's Exhibits will be referred to as "DR Ex. __." The Trustee's Exhibits will be referred to as "TR Ex. __." The Firm's Exhibits will be referred to as "WDY Ex.__." Ms. Nsiah's Exhibits will be referred to as "EN Ex. __."

[2]  Oddly, the same firm issued a different valuation of the Ghana Property as of the same date, June 1, 2020, with a market value of $190,000.00 (USD), and a forced sale value of $152,000.00 (USD). DR Ex. K, at 2 (Docket No. 39). The differences in the two valuations were not explained.

10.     The Debtor also submitted Answers to Interrogatories under oath during the divorce proceedings in which he stated that the Ghana Property had a fair market value of $250,000.00. TR Ex. 5, at 5 (Docket No. 62). The Debtor described the Ghana Property as an "8 bedroom, 3 living areas, 6 toilets property that is about 80% complete." TR Ex. 5, at 5 (Docket No. 62).

11.     The Circuit Court found that the Ghana Property was marital property. WDY Ex. 5, at 29 (Docket No. 66) (Letter Opinion dated May 27, 2021). The court additionally found that it was unable to determine the value of the Ghana Property. It ordered the Ghana Property to be sold, with the net proceeds to be split between the parties. WDY Ex. 5, at 29 (Docket No. 66).

12.     The Circuit Court entered a Final Decree of Divorce on September 8, 2021. The court awarded Ms. Nsiah $33,952.50 as equitable distribution, payable within 90 days.[3] WDY Ex. 5, at 5 (Docket No. 66). It also ordered the Debtor to pay $15,000.00 in attorney's fees to Ms. Nsiah within 90 days, and $1,015.00 for the guardian ad litem's fees within 30 days. WDY Ex. 5, at 5 (Docket No. 66).

13.      The Circuit Court awarded the marital home at 3 Coulter Lane in Stafford to the Debtor. WDY Ex. 5, at 29 (Docket No. 66). The court determined the home to have a value of $420,000.00, with a mortgage of $294,707.00, and equity of $125,293.00. WDY Ex. 5, at 29 (Docket No. 66).

14.     The Debtor attempted to refinance the Coulter Lane property to pay the equitable distribution award. He was approved for a refinance but, before he was able to close on the loan, the lender discovered that the Firm had placed an attorney's lien against the property for the

---

[3]  The Circuit Court issued a Letter Opinion on May 27, 2021, and a second Letter Opinion on July 22, 2021, both of which were incorporated into the Final Decree of Divorce. WDY Ex. 5, at 21-37 (Docket No. 66). The May 27th Letter Opinion awarded $37,491.50 in an equitable distribution award to Ms. Nsiah, but this was reduced to $33,952.50 in the July 22, 2021, Letter Opinion. WDY Ex. 5, at 31, 37 (Docket No 66).

payment of its fees ("the Attorney's Lien"). The Debtor attempted to negotiate a repayment plan with the Firm, but the parties were unable to come to an agreement.[4]

15.    Faced with the Attorney's Lien, and an inability to reach an agreement with the Firm, the Debtor began contemplating bankruptcy. *See* DR Ex. A (Docket No. 37).

B. *The Purchase of the 2021 Toyota Highlander.*

16.    During the refinance, the Debtor was advised that he needed to bring down his debt-to-income ratio. At the time, he owned a 2015 Toyota Highlander. In June 2021, he "borrowed" $5,000.00 from his company, Tech Giants, and later paid off the loan on this vehicle. EN Ex. 11, at 7 (Docket No. 32) (transfer of $5,000.00 to the Debtor, dated June 14, 2021); EN Ex. 12, at 12 (Docket No. 33) (deposit of $5,000.00 from Tech Giants, dated June 14, 2021). Although Tech Giants advanced the Debtor $5,000 in June to pay off the car loan, the Debtor testified that he put the funds in his Robin Hood stock trading account, and that he paid off the car loan in August.

17.    The Debtor and Mr. Goldberg spoke by telephone on September 21, 2021. DR Ex. A (Docket No. 37). They discussed the possibility of a new car loan, but Mr. Goldberg did not advise the Debtor to purchase a new vehicle. DR Ex. A, at 1 (Docket No. 37) (Mr. Goldberg: "We should also discuss the possibility of you getting a car loan. This would help in the determination of how much you must pay to your creditors in a Chapter 13.").

18.    The Debtor made an appointment to meet with Mr. Goldberg on Monday, September 27, 2021. The Debtor testified that they met in person on Tuesday, September 28th.

19.    Prior to meeting with Mr. Goldberg, the Debtor performed some online research concerning personal bankruptcy. He decided that the pre-petition purchase of a new car would be "prudent financial planning."

---

[4]  The Debtor has filed an Adversary Proceeding in this Court seeking to avoid the lien. Compl., *Asamoah v. Woehrle Dahlberg Jones & Yao, PLLC,* Adv. Pro. 22-01004-BFK (Docket No. 1).

20.     On Saturday, September 25, 2021, the Debtor purchased a new 2021 Toyota Highlander. TR Ex. 7 (Docket No. 62). The purchase price was $45,443.00, which included an Extended Service Contract for $3,640.00 and a VIP Membership for $985.00. TR Ex. 7, at 1 (Docket No. 62).

21.     The Debtor traded in his 2015 Highlander (which by then was lien-free), for which he received a credit on the new purchase in the amount of $19,250.00. TR Ex. 7, at 1 (Docket No. 62). The 2015 Highlander had 113,765 miles on it at the time of the trade-in. TR Ex. 7, at 1 (Docket No. 62).

22.     He financed the purchase with a loan from the Dealer in the principal amount of $33,235.60. TR Ex. 7, at 1 (Docket No. 62). The Dealer assigned the loan to Northwest Federal Credit Union. TR Ex. 7, at 3 (Docket No. 62). The monthly payment on the new vehicle is $453.94. TR Ex. 7, at 5 (Docket No. 62).

*C. The Debtor's Pre-Petition Income.*

23.     The Debtor's pre-petition income has been the source of some controversy and confusion in this case.[5]

24.     In the State Court, the Debtor listed his gross monthly income in the amount of $12,499.00, as of April 2020 (based on his income from his former employer, Connexions Data, Inc.). WDY Ex. 13 (Docket No. 66).

25.     The Circuit Court found that the Debtor's monthly income was $11,000.00 per month. WDY Ex. 5, at 24 (Docket No. 66).

26.     The Debtor claims to have taken out $14,100.00 in loans from Tech Giants during 2021 (including the $5,000.00 to pay off the 2015 Toyota Highlander loan). WDY Ex. 12, at 16

---

[5]  Under the Means Test the Court looks to the Debtor's average income during the six months preceding the filing of the bankruptcy case to determine the Debtor's disposable income. 11 U.S.C. §§ 1325(b), 101(10A).

(Docket No. 66). The Debtor characterized these amounts as loans against his 401(k) contributions. There is, however, no documentation for any of these loans. The parties dispute whether these amounts should be characterized as loans or as additional income.

27.     The Debtor's pay stubs for 2021 from Tech Giants range in amount from a low of $8,667.00 to a high of $10,880.00, although in December there was $0.00 in income. EN Ex. 9, at 5, 7-9 (Docket No. 30). The December paystub stated Total Pay Year to Date (YTD) in the amount of $120,334.00 (or $10,027.83 per month). EN Ex. 9, at 5 (Docket No. 30).

28.     The Debtor's 2020 W-2 Wage Statement from Tech Giants indicates gross wages of $103,243.72 and Medicare wages of $114,486.16 (or $9,540.51 per month). EN Ex. 18, at 35 (Docket No. 66).

29.     It appears that the Debtor was paying a number of his personal expenses through Tech Giants. For example, he was paying his auto insurance ($156.42 per month), and his 2015 Toyota Highlander payments ($629.49 per month) before he paid off the loan. EN Ex. 11, at 3, 7, 13, 17, 18, 23, 27 (Docket No. 32).

30.     The Debtor also caused Tech Giants to pay tuition for his daughter to attend Virginia Tech. EN Ex. 11, at 17, 27 (Docket No. 66) (payments to Virginia Tech on August 20 and October 7, 2021, for $2,270.38 and $2,372.04, respectively).

D.  *The Debtor's 401(k) Loan.*

31.     In December 2019, the Debtor applied for and received approval of a loan against his John Hancock 401(k) savings, in the amount of $27,000.00. DR Ex. E (Docket No. 37). The loan accrues interest at the rate of 6.75% annually and is due and payable in full on December 25, 2024. DR Ex. F (Docket No. 37).

32.     The Debtor made no payments on this loan before filing for bankruptcy.

E. *The Debtor Files for Bankruptcy.*

33.     The Debtor filed a Voluntary Petition under Chapter 13 on November 15, 2021. (Docket No. 1).

34.     On February 1, 2022, Tech Giants contributed $11,842.44 to the Debtor's retirement account with Merrill Lynch. DR Ex. S (Docket No. 67). The Debtor testified that this amount was in partial repayment of the alleged 401(k) contribution loans totaling $14,100.00, described above.

(i)     *The Listing of the Ghana Property in the Debtor's Schedules.*

35.     Schedule A/B requires debtors to list all real estate and personal property. Schedule A/B requires debtors to state the "current value of the entire property."

36.     The Debtor listed the Ghana Property in his Schedule A/B with a value of $10,000.00. TR Ex. 1 (Docket No. 62).

37.     There are several boxes on Schedule A/B that debtors can check to describe property, including "Single-family home," and "Land." The Debtor checked the box labeled "Single-family home." TR Ex. 1 (Docket No. 62). He did not check the box labeled "Land." TR Ex. 1 (Docket No. 62). He included a statement in Schedule A/B that "[t]he house is only partially built." TR Ex. 1 (Docket No. 62).

38.     The Debtor testified that he intended the $10,000 to be a "land-only" valuation, that is, excluding the partially completed residence. The Debtor did not state a separate value for the residence anywhere else in his Schedules.

39.     In each of the Chapter 13 Plans filed in this case, the Debtor stated that he would sell the Ghana Property, with half of the proceeds to go to Ms. Nsiah, and half of the proceeds to

be paid to the bankruptcy estate. Plan ¶ 12 (Docket No. 2); Am. Plan ¶ 12 (Docket No. 54); Second

Am. Plan ¶ 12 (Docket No. 59).

40.    The Debtor has signed an Engagement to List the Ghana Property. DR Ex. T

(Docket No. 67). The property would be listed for $192,000.00 (USD). The Debtor testified that

Ms. Nsiah is willing to sign the Engagement, so that the property can be listed and sold. The

property will be sold "as is," in its current state.

(ii)    *The Debtor's Disposable Income and Chapter 13 Plans.*

41.    In his first Means Test, the Debtor calculated his disposable monthly income to be

$537.14. Pet. at 72 (Docket No. 1).

42.    On his Means Test and his Amended Means Test, the Debtor has taken a deduction

for the monthly payment on the 2021 Toyota Highlander in the amount of $454.00. Pet. at 68

(Docket No. 1); Am. Schedules/Statements at 25 (Docket No. 25).

43.    His initial Chapter 13 Plan called for payments to the Trustee in the amount of

$1,380.00 per month for 60 months, for an estimated distribution to the unsecured creditors of

28%. Plan ¶¶ 2, 5(A) (Docket No. 2).

44.    In his Amended Means Test, the Debtor calculated his disposable monthly income

to be $1,207.58. Am. Schedules/Statements at 29 (Docket No. 25).

45.    Apparently, the 28% in the First Plan did not include the proceeds of the Ghana

Property because in his First Amended Plan the Debtor proposed to pay the same $1,380.00 per

month plus the proceeds of the Ghana Property, for an estimated distribution of 60% to the

unsecured creditors. Am. Plan ¶¶ 2, 5(A) (Docket No. 54).

46.     In his Second Amended Plan the Debtor proposed an increased plan payment of $1,980.00, for an estimated distribution of 75% to the unsecured creditors. Second. Am. Plan ¶¶ 2, 5(A) (Docket No. 59).

(iii)     *The Deduction for Repayment of the 401(k) Loan.*

47.     In his Means Test and his Amended Means Test, the Debtor has taken a deduction in the amounts of $530.00 and $531.45, respectively, for repayment of the $27,000.00 401(k) loan. Pet. at 72 (Docket No. 1); Am. Schedules/Statements at 29 (Docket No. 25).

48.     In both Means Tests, the Debtor stated that this change was implemented on November 13, 2021 (two days before he filed his Petition). Pet. at 72 (Docket No. 1); Am. Schedules/Statements at 29 (Docket No. 25).

(iv)     *The Debtor's Testimony at the Meeting of Creditors.*

49.     The Meeting of Creditors was held on December 21, 2021. At the meeting, the Debtor testified that he purchased the 2021 Highlander before he met with Mr. Goldberg.

50.     At the hearing on February 25, 2022, the Debtor acknowledged that he and Mr. Goldberg had spoken by telephone a few days before he purchased the 2021 Highlander. He testified that what he meant at the Meeting of Creditors was that he had not met in person with Mr. Goldberg before he purchased the new vehicle.

51.     The Debtor also testified at the Meeting of Creditors that he had six payments left on the 2015 Highlander at the time that he purchased the new Highlander. This was not accurate; he had approximately six payments to go at the time that he paid off the loan on the 2015 Highlander in August 2021.

(v)     *The Debtor's Testimony at the Hearing on February 25, 2022.*

52.     At the hearing on February 25, 2022, the Debtor testified that he was capable of filing, and intended to file, a Chapter 13 Plan that would pay 100% to his creditors. This, he testified, would result from: (a) foregoing the voluntary contributions to his retirement account ($780.40); (b) deleting the $530.00 for the 401(k)-loan repayment; (c) deleting the $300.00 in cell phone charges, which are being paid by Tech Giants; and (d) deleting the deduction for auto insurance ($167.00), which is also being paid by Tech Giants.[6]

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

The Trustee's Motion to Dismiss, joined by Ms. Nsiah, the Firm, and Mr. Goldberg for substantially the same reasons, alleges that the Debtor filed this case in bad faith. (Docket Nos. 14, 49). Specifically, the Trustee argues that the Debtor took on new debt and manipulated his existing debts in an attempt to reduce his payment obligations in Chapter 13. The Trustee further argues that the Debtor gave false oaths in the scheduling and valuation of the Ghana Property, and in his testimony at the Meeting of Creditors concerning the purchase of the 2021 Highlander. Mr. Goldberg and the Firm additionally dispute the accuracy of the Debtor's disposable monthly income calculations. (Docket Nos. 16, 17).

The requirement of good faith "is imposed on the debtor at two stages in a Chapter 13 proceeding; first, the debtor must file the petition for Chapter 13 bankruptcy in good faith, and

---

[6]  At some point, the Debtor may incur a tax liability to the extent he defaults on repayment of the 401(k) loans.

second, the debtor must file the Chapter 13 plan in good faith." *In re Brandland*, 570 B.R. 203,

217 (Bankr. E.D. Va. 2017) (quoting *In re Colston,* 539 B.R.738, 746 (Bankr. W.D. Va. 2015)).

In *Deans v. O'Donnell*, the Fourth Circuit held that, "[b]roadly speaking, the basic inquiry

[with respect to good faith] should be whether or not under the circumstances of the case there has

been an abuse of the provisions, purpose, or spirit of [Chapter 13] in the proposal or plan[.]" 692

F.2d 968, 972 (4th Cir. 1982) (quoting 9 *Collier on Bankruptcy* ¶ 9.20, at 319 (14th ed. 1978)). In

assessing whether a plan is filed in good faith, the Fourth Circuit has identified a non-exhaustive

list of factors including:

> not only the percentage of proposed repayment, but also the debtor's financial
> situation, the period of time payment will be made, the debtor's employment history
> and prospects, the nature and amount of unsecured claims, the debtor's past
> bankruptcy filings, the debtor's honesty in representing facts, and any unusual or
> exceptional problems facing the particular debtor.

*Id*.; *see also Neufeld v. Freeman*, 794 F.2d 149, 152-53 (4th Cir. 1986) (holding that a debtor's pre-

petition conduct is relevant to the good faith inquiry). The totality of the circumstances must be

examined on a case-by-case basis. *Deans*, 692 F.2d at 972.

The Court will address the parties' specific good faith concerns, below.

**I.   The Ghana Property.**

The Trustee, supported by the creditors, argues that the Debtor's valuation of the Ghana

Property was unreasonably low and intentionally so. The Fourth Circuit addressed the issue of

valuation of a debtor's property in *Robinson v. Worley*, 849 F.3d 577 (4th Cir. 2017). The *Worley*

case involved an objection to discharge for a Chapter 7 debtor who allegedly understated the value

of an asset on his Schedules. *See id.* at 581. The debtor held a 49% interest in a real estate limited

liability company for which he made an initial capital contribution of $65,000. *See id.* The

investment company's sole investment was a 10% interest in a landholding group which owned

587 acres of timberland, which in turn was valued at $1.32 million. *See id.* The debtor stated in his

Schedules that his interest in the limited liability company had a market value of $2,500. *See id.*

The bankruptcy court denied Mr. Worley's discharge, holding that he had made a false oath in his

Schedules with respect to the investment. *See id.* at 582. The district court affirmed. *See id.*

The Fourth Circuit affirmed the district court's decision. The Fourth Circuit noted that Mr.

Worley's chosen method of valuing his investment, the income capitalization approach, was

destined to result in an unreasonably low value because the property had only incidental income

from hunting licenses and the like. *See id.* at 584. The court explained:

> We recognize, of course, that real estate valuation is as much art as science, and
> that measurements of intrinsic value more often involve a range of reasonable
> values rather than a single point estimate. But some valuation models and estimates
> simply fall outside the realm of common sense. Based on the particular attributes
> of the investment here, the bankruptcy court was entitled to hold that this was one
> of those instances.

*Id.* at 585.[7]

In this case, the Debtor valued the Ghana Property in his Schedule A/B at $10,000, which

he testified was a "land-only" valuation. The Debtor undoubtedly was presented with some

difficulty in valuing a nearly completed residence in a foreign country. That notwithstanding, the

Court finds the Debtor's "land-only" valuation was unreasonable. *See id.* The Debtor stated under

oath in the State Court that the property had a value of $250,000. TR Ex. 5, at 5 (Docket No. 62).

Further, the Debtor had in his possession an appraisal indicating that the property had a market

value of $254,000 (USD), and a forced sale value of $203,200 (USD), as of June 1, 2020. TR Ex.

6 (Docket No. 62). Schedule A/B requires the Debtor to state the "entire" value of property. There

---

[7]  The Fourth Circuit also addressed the advice-of-counsel defense, noting that "[w]hile reliance on counsel
generally absolves a debtor of fraudulent intent . . . the bankruptcy court must still consider whether the debtor acted
in good faith[.]" *Worley*, 849 F.3d at 577 (citations omitted). The Debtor did not assert an advice-of-counsel defense
in this case.

are boxes to check for "single-family home" and "land." The Debtor checked the box for single-family residence. If the $10,000 estimate was intended as a land-only valuation, nowhere in the Schedules did the Debtor list or attempt to state a value for the improvements. Whatever the value of the Ghana Property may be, it was worth substantially more than $10,000 at the time the Debtor filed his Schedules in this case.

The Debtor defends his use of the $10,000 valuation by stating that he disclosed that this was a land-only valuation at the Meeting of Creditors, and that both of his Plans call for the sale of the Ghana Property and the contribution of his half of the proceeds to the bankruptcy estate. Testimony at a meeting of creditors, however, is not a substitute for accurately listing the value of assets in the Schedules. *Cf. Stevens v. Whitmore* (*In re Stevens*), 15 F.4th 1214, 1219 (9th Cir. 2021) (in the context of implied abandonment, "abandonment under § 554(c) requires listing on a schedule . . . anything else (e.g., actual knowledge of the trustee, ad hoc oral disclosures, discussion at the § 341 meeting of creditors) is not enough"). The Court, the Trustee, and the creditors must be able to rely on the Schedules without reference to what might have occurred at the Meeting of Creditors.

On balance, the Court finds that the Debtor materially and intentionally understated the value of the Ghana Property.

**II.  The Purchase of the 2021 Highlander.**

The Trustee and the creditors next object to the Debtor's purchase of the 2021 Highlander as an indication of bad faith. The Trustee argues that the vehicle purchase was problematic in three ways. First, the Trustee argues that the purchase itself, less than six weeks before the bankruptcy filing, was an act of bad faith. Second, the Trustee argues that the Debtor failed to list the trade-in of the 2015 Highlander in his Statement of Financial Affairs. Third, the Trustee argues that the

Debtor testified falsely at the Meeting of Creditors to the effect that: (a) he had six payments left on the 2015 Highlander loan at the time that he purchased the 2021 Highlander; and (b) he had not met with counsel before he purchased the vehicle, when he had in fact spoken with Mr. Goldberg. (Docket Nos. 14, 49). The Court will address each of these concerns.

    A.   *The Purchase of the New Vehicle.*

    The Trustee's first objection concerns the vehicle purchase itself. The Trustee describes the purchase as a "last-minute transaction" made with the intent to reduce the Debtor's Disposable Monthly Income. On this issue, the Court is guided by the Supreme Court's decision in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010).

    In *Milavetz*, the Court addressed the constitutionality of 11 U.S.C. § 526(a)(4), which prohibits professionals from "advis[ing] an assisted person . . . to incur more debt in contemplation of [filing for bankruptcy]." The Court distinguished between debt that is incurred for the "impelling reason" of an anticipated bankruptcy, and debt that is incurred for valid, non-bankruptcy reasons. 559 U.S. at 245. The Court clarified in a footnote that § 526(a)(4) prohibits advice to incur debt that is *principally motivated* by the possibility of filing for bankruptcy. *Id*. at 248 n.6 ("[A]dvice to refinance a mortgage or purchase a reliable car prior to filing because doing so will reduce the debtor's interest rates or improve his ability to repay is not prohibited, as the promise of enhanced financial prospects, rather than the anticipated filing, is the impelling cause."). By contrast, advice that is solely motivated by an impending bankruptcy, and that diminishes the debtor's ability repay creditors, is prohibited. *Id.* at 245. The Court further noted that incurring debt with the expectation of obtaining its discharge is "abusive per se." *Id.* at 244.

    Whether incurring debt for the purchase of a vehicle shortly before filing for bankruptcy constitutes bad faith depends on the facts and circumstances of each case. For example, in *In re*

14

*Wolf,* the Court overruled the trustee's objections to confirmation of the debtor's Chapter 13 plan, where the trustee argued that the debtor's eve-of-bankruptcy purchase of a vehicle was bad faith conduct. Case No. 13-13174-BFK, Docket No. 17. The Court, looking to the totality of the circumstances, and relying on *Milavetz*, held that the Debtor was not guilty of bad faith. *See id.* In *Wolf*, the Debtor traded in a 2005 Ford Mustang and purchased a Ford Focus. *See id.* at 1. The Mustang had no lien, and the monthly payment on the Focus was $419.39. *See id.* On the other hand, the Mustang was a gas guzzler and had substantially higher insurance premiums than the Focus. *See id.* at 3. The Mustang was seven years old and probably would have needed to be replaced, or would have required substantial repairs, during the course of the debtor's five-year plan. *See id.* On balance, the Court found that the debtor in *Wolf* was not guilty of bad faith conduct. *See id.* at 7.

The Court again addressed the issue in *In re Trumble.* Case No. 19-14092-BFK, Docket No. 59. In *Trumble,* the debtor purchased an Acura RDX with a monthly payment of $770.25 shortly after a judgment had been entered against her in State Court and while she was contemplating filing for bankruptcy. *See id.* at 8. Notably, she did not trade in or sell her existing vehicle, a 2010 Honda Fit. *See id.* The Court found her testimony, that she needed the Fit as a "backup," not to be credible, and held that she was guilty of bad faith. *See id.* The Court granted her leave to file an Amended Plan without subtracting the car payment for the Acura from her disposable income, and later confirmed a Modified Plan. Case No. 19-14092-BFK, Docket No. 70.

In this case, the Debtor's vehicle purchase is precisely the type of pre-petition conduct the Supreme Court discouraged in *Milavetz*. The Debtor testified that he was motivated to purchase the 2021 Highlander solely because he was contemplating a bankruptcy filing. Indeed, there was

no other discernable reason to purchase the car. The 2015 Highlander had no debt against it (even if he had not paid off the loan in August, there would have only been six monthly payments, not eighty-four payments, as he had for the 2021 Highlander when he filed for bankruptcy). Further, unlike in *Wolf*, there was no testimony that the car needed substantial repairs or that the Debtor was even concerned about repairs during the life of his Chapter 13 case. The insurance probably would have been cheaper for the older vehicle. The Debtor characterizes his vehicle purchase as "prudent financial planning," but to this extent he appears to have misread *Milavetz* to permit the purchase of a new car on the eve of bankruptcy under *any* circumstances, which is not correct.

The Court finds that the purchase of the 2021 Highlander was done solely in contemplation of bankruptcy and for no other legitimate purpose. As such, the Court finds that this purchase was made in bad faith.

### B. *The Statement of Financial Affairs.*

Section 18 of the Statement of Financial Affairs requires the debtor to list any sales, trades, or transfers of property not in the ordinary course of the debtor's business or financial affairs, within the two years preceding the bankruptcy. In this case, the Debtor did not list the trade-in of the 2015 Highlander, which occurred within two months of his bankruptcy filing. Pet. at 56 (Docket No. 1). He later corrected this, in his Amended Statement of Financial Affairs. Am. Schedules/Statements at 38 (Docket No. 25).[8]

The Court finds that the failure to list the trade-in of the 2015 Highlander in the original Statement of Financial Affairs was inadvertent, and that it was timely corrected in the Amended Statement of Financial Affairs. The Court finds no bad faith on this issue.

---

[8]  The Debtor also failed initially to list his payment to Mr. Goldberg's firm for pre-petition services. Pet. at 55-56 (Docket No. 1). This was later corrected in the Amended Statement of Financial Affairs. Am. Schedules/Statements at 37-38 (Docket No. 25) (showing payment of $1,000.00 to Banks. & Associates).

C.  *The Debtor's Testimony at the Meeting of Creditors.*

Finally, the Trustee submits that the Debtor testified falsely at the Meeting of Creditors in two respects. First, the Trustee argues that the Debtor testified falsely when he said that he had six months of payments to go on the 2015 Highlander loan at the time he purchased the 2021 Highlander. Second, the Trustee argues that the Debtor testified falsely when he stated that he had not met with bankruptcy counsel before purchasing the 2021 Highlander.

With respect to the first alleged falsity, the Court can see how the Debtor might have been confused between the time that he paid off the loan and when he purchased the new Highlander. The Court does not find any intent to deceive here.

Turning to the second statement, the Court similarly can see how the Debtor misunderstood the question – whether he "met" with an attorney – to mean an in-person meeting. The Debtor could have been more forthcoming here, but the Court finds no intent to deceive in his answer.

**III. The Debtor's Disposable Income.**

Finally, the Trustee and the creditors object to the Debtor's disposable monthly income calculations. This is easily the most confusing and difficult part of this case. It appears to have been a moving target throughout the case. The problem has been exacerbated because the Debtor is the sole owner of Tech Giants and has been using the corporation to pay personal expenses, such as his car payments, auto insurance, and college tuition for his daughter, thereby skewing his disposable income downward.

A.  *The $27,000 Retirement Account Loan Repayment.*

The Debtor has taken a deduction in the amount of $530.00 for repayment of the $27,000 401(k) loan in both his Means Test and his Amended Means Test. Pet. at 72 (Docket No. 1); Am.

Schedules/Statements at 29 (Docket No. 25). With respect to retirement loan repayments, § 1322(f) provides as follows:

> A plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute "disposable income" under section 1325.

11 U.S.C. § 1322(f).[9] In enacting § 1322(f) Congress sought to ensure that debtors in Chapter 13 repay their retirement plan loans, so that when they exit Chapter 13, they can resume voluntary contributions to their retirement accounts (most retirement plans preclude participants from contributing to the plan when the participant has outstanding loans). *See In re Mati*, 390 B.R. 11, 17 (Bankr. D. Mass. 2008) ("[B]y excluding 401(k) contributions from property of the estate and expressly removing them from the definition of disposable income under section 1325(b) . . . Congress has implemented a policy of protecting and encouraging retirement savings."). Like voluntary contributions to retirement accounts allowed under § 541(b)(7), *see In re Cantu*, 553 B.R. 565, 575-77 (Bankr. E.D. Va. 2016), *aff'd sub nom. Gorman v. Cantu*, 713 F. App'x 200 (4th Cir. 2017), the § 1322(f) deduction is subject to a good faith analysis. *See In re Paliev,* No. 11-17647-BFK, 2012 WL 3564031, *11 (Bankr. E.D. Va. Aug. 17, 2012) ("The Court can see some circumstances where [the § 1322(f)] deduction would be disallowed on good faith grounds, as for example, where the Debtor takes a 401(k) loan on the eve of her bankruptcy filing in order to purchase luxury goods that she then exempts on Schedule C, or with which she takes a trip to the Bahamas.").

---

[9]  Section 362(b)(19) provides an exception to the automatic stay for "withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer[.]"

The Debtor, in deducting $530.00 from his disposable income, asserts that he is simply doing what Congress has permitted in § 1322(f). The Trustee responds that the Debtor began making the loan payments only a few days before he filed for bankruptcy. The Court would not allow the Debtor in this case to deduct any amount for repayment of the so-called $14,100 in loans from Tech Giants, because these loans aren't documented and are more accurately characterized as income. The $27,000.00 401(k) loan, on the other hand, is real, and there is no suggestion that the loan was taken for improper purposes or in contemplation of bankruptcy (it was taken out in December 2019). The Court does not find any bad faith in the Debtor's deduction for repayment of an actual 401(k) loan, even where the Debtor elects to begin repaying the loan when he enters bankruptcy. The Court, therefore, disallows the deduction for repayment of the $14,100 in alleged 401(k) loans, but will allow the deduction for repayment of the $27,000.00 401(k) loan.

B.  *Other Issues.*

The Court finds that the Debtor's statement of his monthly income in his Means Test and Amended Means Test (both $10,366.67) is accurate and is consistent with his pay stubs and tax returns. Pet. at 63 (Docket No. 1); Am. Schedules/Statements at 20 (Docket No. 25). There are legitimate questions about the Debtor's payment of personal expenses through his corporation, some of which he would be entitled to deduct on the means test, others of which are questionable and would not be allowed. Section 707(b)(2)(A)(ii)(IV), for example, limits educational expenses to $2,050.00 per year per child "to attend a private or public elementary or secondary school." It does not, however, permit deductions for college expenses for adult-aged (that is, 18 or over) dependents of the debtor.

The Debtor, however, has now committed to filing a 100% Plan and to making the Plan work, by not making any 401(k) contributions ($780.00 per month) during the case and by not

repaying the 401(k) loan ($530 per month) during the case. He acknowledges that he will have a tax liability as a result.

### IV. The Remedy.

The Debtor filed this case in bad faith in: (a) listing the Ghana Property at an unsupportable value of $10,000.00, and (b) purchasing the 2021 Highlander on the eve of bankruptcy for no other reason than to shift the cost of the new vehicle to his creditors. On the other hand, he has committed to making adjustments that will result in a 100% Plan.

The Court is faced with three alternatives – dismissal, conversion, or imposing a 100% plan requirement – all of which are unpalatable for their own reasons. Dismissal will simply cause the creditors to exercise their state law remedies and engage in the proverbial "race to the courthouse." A conversion to Chapter 7 will almost certainly result in the sale of the Debtor's primary residence in Stafford, which goes against Chapter 13's goal of maintaining home ownership, especially where the Debtor has the ability to repay his creditors over time. Imposing a 100% plan requirement carries with it the risk that the Court could be seen as countenancing a "no harm, no foul" approach, which it does not. *See Tavenner v. Smoot*, 257 F.3d 401, 407 (4th Cir. 2001) (rejecting the "no harm, no foul" rule, and holding that an individual debtor may be denied a discharge under § 727 for a transfer of exempt property).

On balance, the Court finds that imposing a 100% requirement in this case is the most fair and equitable result and serves the interests of the creditors and the Debtor. The creditors will be paid in full. The Debtor will save his home. Further, the Debtor is being penalized by having to forego any 401(k) contributions ($780.00 per month) during the case and by not repaying his 401(k) loan ($530 per month). As a result, the Debtor may have a non-dischargeable tax liability

at the conclusion of the case, and he may have to deal with a § 1305 claim from the IRS within the case.

The Court will order that the Debtor promptly file and obtain confirmation of a Chapter 13 Plan that pays all of his creditors 100% of their claims. If the Debtor is unable to confirm a 100% Plan, or if for any reason the case is dismissed (or if the Debtor seeks to convert the case) before the case is closed, the Court will dismiss the case with prejudice for a period of one year.[10]

### Conclusion

It is therefore **ORDERED:**

A.  The Trustee's and Ms. Nsiah's Motions to Dismiss are granted in part. (Docket Nos. 14, 19). The Debtor must promptly file and obtain confirmation of a Chapter 13 Plan that pays all of his creditors 100% of their claims. If the Debtor is unable to confirm a 100% Plan, or if for any reason the case is dismissed at any time (or if the Debtor seeks to convert the case) before the case is closed, the Court will dismiss the case with prejudice for a period of one year.

B.  The Clerk will mail copies of this Memorandum Opinion and Order, or will provide CM/ECF notice of its entry, to the parties below.

Date: Mar 29 2022

Alexandria, Virginia

/s/ Brian F Kenney

The Honorable Brian F. Kenney
United States Bankruptcy Judge

Entered On Docket: March 29, 2022

---

[10]  It is not clear whether the Debtor needs to continue to pursue his Adversary Complaint to avoid the Firm's Attorney's Lien, where his Plan is to pay all creditors at 100 cents on the dollar. The parties may continue to dispute whether the firm is entitled to post-petition interest as a judgment creditor, which will depend on whether the Firm's lien is enforceable. The Court makes no factual findings or conclusions of law as to the validity or enforceability of the Attorney's Lien here.

Copies to:

Stephen Neuman Asamoah
3 Coulter Lane
Stafford, VA 22554
*Chapter 13 Debtor*

Robert S. Brandt, Esquire
1513 King Street
Alexandria, VA 22314
*Counsel for Elizabeth Nana Nsiah*

Joseph M. Goldberg, Esquire
3158 Golansky Blvd., Suite 210
Woodbridge, VA 22192
*Creditor*

Thomas Woehrle, Esquire
2016 LaFayette Blvd, Suite 101
Fredericksburg, VA
*Creditor*

Thomas P. Gorman, Esquire
300 N. Washington St. Ste. 400
Alexandria, VA 22314
*Chapter 13 Trustee*

Martin C. Conway, Esquire
12934 Harbor Drive, Suite 107
Woodbridge, VA 22192
*Counsel for the Debtor*